**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

POINT CONTRACTING, LLC,

      Plaintiff,

v.                                                                                    No. 2:24-cv-00562-SMD-KRS

URBAN INVESTMENT RESEARCH
CORP. and WEST ROSWELL NM, LLC,

      Defendants.

## <u>ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT</u>

    **THIS MATTER** is before the Court on Plaintiff's motion for summary judgment.  Doc. 61 ("Pl.'s Mot. for SJ").  Defendants filed their response and Plaintiff replied.  Doc. 63 ("Defs.' Resp."); Doc. 66 ("Pl.'s Reply").  Upon careful consideration of the record, relevant law, and the parties' briefing, the Court **DENIES** Plaintiff's motion.

## BACKGROUND

    The present dispute arises from a construction project in Roswell, New Mexico.  In the spring of 2022, Defendants Urban Investment Research Corporation ("UIRC") and West Roswell NM LLC (collectively "Defendants") hired Point Contracting ("Plaintiff") to perform a variety of improvements on a building the Bureau of Land Management ("BLM") leases.  Relations between the parties began to deteriorate beginning in 2023; Defendants were dissatisfied with Plaintiff's work, Plaintiff was upset over Defendants' failure to pay for the work it had performed, and so on.  This cycle of rebuked payment requests followed by punch lists of corrections never reached a resolution.  Instead, Defendants retained over $80,000, asserting that they were forced to spend more than that to correct Plaintiff's purported shoddy work, and Plaintiff sued, alleging that Defendants breached their contract and New Mexico state law.

Plaintiff filed suit on July 25, 2023, in the Fifth Judicial District Court, County of Chaves, State of New Mexico.  Doc. 1, Ex. 2 at 3.  Plaintiff asserts four claims—breach of the New Mexico Prompt Payment Act, breach of contract as to the tenant improvement ("TI") Project, breach of contract as to the shell project, and failure to uphold the implied covenant of good faith and fair dealing.  *Id.* at 7–8.  Defendants removed the case to federal court and counterclaimed for breach of contract, alleging that Plaintiff "walked off the project without completing all of the many defective and incomplete construction work set forth in the GSA's final punch list."  Doc. 1; Doc. 17 ¶ 7.  The parties proceeded through discovery.  Plaintiff now moves for summary judgment on the New Mexico Prompt Payment Act Claim, Defendants' counterclaim, and the breach of contract claims.  *See* Pl.'s Mot. for SJ at 16, 18, and 23.

**STATEMENT OF MATERIAL FACTS**

I.      The Contract

Defendant West Roswell owns 2909 W. 2nd Street, Roswell, NM 88201 (the "Space").  Pl.'s Mot. for SJ ¶¶ 1, 7.  The United States General Services Administration ("GSA") leases the Space for the United States Bureau of Land Management's ("BLM's") use.  *Id.* ¶ 3.  Defendants hired Plaintiff to perform construction services on the Space.  *Id.* ¶¶ 3–4.  On April 7, 2022, the parties executed two work agreements (the "Contracts"), memorializing their contractual obligations and defining Plaintiff's scope of work.  *Id.* ¶ 7.  One contract was for shell improvements—installing door hardware, adding insulation, updating the plumbing space, and performing electrical work—and one contract was for TI—adding security features, fire suppression, and updating the lighting.  *Id.* ¶ 5.  Under the Contracts, the Owner must pay Plaintiff the fixed amount specified in the attached "Description of Work."  Doc. 61, Ex. 2 at 92.  The fixed amount for the shell improvements was $1,666,566.46 and the fixed amount for the tenant

improvements was $1,837,189.34. *Id.* at 14, 24. The terms and conditions section specify that Defendants must pay Plaintiff undisputed amounts within 30 days of receiving an invoice, but may "withhold amounts that Owner disputes are payable, pending resolution of the dispute." *Id.* at 10.

The Contracts further provide that Plaintiff may continue performing corrections for up to "one year after completion of the Work." Pl.'s Mot. for SJ ¶ 14; Doc. 61, Ex. 2 at 4. The Contracts do not define "completion." However, the attached Schedule of Work lists the "final milestone" as "Substantial Completion/Acceptance." Pl.'s Mot. for SJ ¶ 11; Doc. 61, Ex. 2 at 9; Defs.' Resp. ¶ D. Work that is performed after completion is called "warranty work." Doc. 61, Ex. 1 ("Warden Dep.") 110:15–112:1. If the owner notifies the contractor of a defect and the contractor must repair its work within five days of receiving notice. Doc. 61, Ex. 2 at 11. If the contractor fails to do so, the Owner has the right to "arrange for another contractor to perform the repair, and the Contractor shall pay amounts due to the separate contractor." *Id.*

The parties also attached the lease agreement between GSA and Defendants. The lease states that the Government "shall accept the space only if the building shell and TI conforming to this lease and the approved [design intent drawings ("DIDs")], if applicable, is substantially complete." Doc. 63, Ex. 1 at 29. The Space is substantially completed "only if the Space may be used for its intended purpose, and completion of remaining work will not interfere with the Government's enjoyment of the Space." *Id.* at 30. Once the Government accepts the Space, that acceptance is "final and binding . . . with respect to conformance of the completed TIs to the approved DIDs with the exception of items identified on a punch list generated as a result of the inspection[.]" *Id.*

II.     The Project

Plaintiff began working on the project in spring of 2022.  In January of 2023, GSA performed an inspection and provided Plaintiff with a punch list of items that needed to be completed.  Pl.'s Mot. for SJ ¶ 17.  GSA completed a second inspection on February 22, 2023, and sent another punch list to Plaintiff.  *Id.*  ¶ 18.  Plaintiff claims that it completed both punch lists. *Id.* ¶¶ 17–18.  Defendants assert that Plaintiff failed to complete work from either punch list and that "Plaintiff was not even present in New Mexico" in February or March of 2023.  Defs.' Resp. ¶ 18.

On February 28, 2023, five days after receiving the second GSA punch list, Nicole Brown, Plaintiff's operations manager, sent Joe Vadenbrink, Defendant UIRC's project manager, a final invoice for $145,972.27 ("Draw 7").[1]  *Id.* ¶ 19; Defs.' Resp. ¶¶ 19, O.  The invoice states that it is for all services related to the Shell and TI Final, with $10,000 reserved for warranty work.  Doc. 61, Ex. 2 at 101.  Kevin Ellis, general manager at Point Contracting, confirmed that the February 28th invoice sought "full payout," meaning a "hundred percent of the change orders and contract amounts." Doc 61, Ex. 4 ("Second Ellis Dep.") 193:7–13.

On March 1, 2023, Vandenbrink emailed Plaintiff with a list of incomplete items from the January inspection.  Defs.' Resp. ¶ 21.  On March 3, 2023, Bryan Crot, senior project manager at GSA, sent an updated version of the February punch list.  *Id.*  The email noted that for Phase 1 acceptance Plaintiff needed to address the sewer odor in the engine bay, the exhaust fans in the shower areas not turning on, and missing electrical drops in the office area.  Pl.'s Mot. for SJ ¶ 26;

---

[1] The exhibits attached to Plaintiff's motions include two invoices—one for the TI work ($64,226.39) and one for the Shell Work ($145,972,27)—which total $210.198.66.  Doc. 61, Ex, 2 at 101–02. Both are dated February 28, 2023. *Id.*  It appears that Brown sent both invoices to Vandenbrink, but is unclear why Plaintiff only refers to the shell final in its UMF.

Doc. 63, Ex. 6 at 2.  The attached inspection report identified itself as a "progress inspection" and noted that "additional inspections" were required.  *Id.*

On April 7, 2023, Vandenbrink emailed a few individuals from GSA about the status of the project.  Vandenbrink attached a list of items that needed to be completed "to reach a level of completion agreed to by all parties and to be inspected on 4/19/2023 and 04/20/2023 by BLM and GSA representatives and accompanied by the Lessor Project Manager."  Doc. 63, Ex. 3 at 153.  "It is understood that during the 04/19 and 04/20 inspection that if any additional item(s) found during that site review, within the scope of the Tenant Improvement, meet the level of criteria that would preclude 'Substantial Completion' and subsequently 'Base Acceptance' they will be evaluated and taken into final consideration for action and resolution."  *Id.*

On April 10, 2023, Brown followed up with Vandenbrink about Draw 7's status.  Pl.'s Mot. for SJ ¶ 28; Doc. 61, Ex. 2 at 61.  Vandenbrink told Plaintiff that Defendants were hesitant to pay the invoice "given the size of the remaining punchlist."  Pl.'s Mot. for SJ ¶ 28.  Plaintiff replied that Defendants are "obligated to pay per the contract and New Mexico Statute regardless of the completion of the final punch list."  *Id.* ¶ 29.  VandenBrink shared that he spoke with Defendants and the Draw 7 funds would be released "once the punch list items are squared away." *Id.* ¶ 29. That same day, Don Davidson, a GSA inspector, emailed Vandenbrink and said that he would be completing an inspection "to determine if the space is substantially completed."  Doc. 63, Ex. 3 at 18.

Plaintiff made itself a punch list (unlike the previous ones which Defendants prepared) on April 11, 2023.  Defs.' Resp. ¶ 31; Pl.'s Reply ¶ FF.  Plaintiff purports to have finished that work on April 16, 2023.  Pl.'s Mot. for SJ ¶¶ 31–32; Doc. 61, Ex. 2 at 31.  Defendants dispute that Plaintiff "completed the referenced punch list on or before April 16, 2023."  Defs.' Resp. ¶ 32.

Ellis notified Defendants that Plaintiff completed this list on April 17, 2023. Doc. 61, Ex. 2 at 81; Defs.' Resp. ¶ 31. Brown then sent Vandenbrink an invoice for $13,586.06 related to the change orders. Doc. 61, Ex. 2 at 40.

On April 19th and 20th, Davidson completed a final inspection of the Space on behalf of GSA. Davidson Aff. ¶¶ 4–5, 16; Defs.' Resp. ¶ P. No representatives from Point Contracting attended the inspection. Defs.' Resp. ¶ 14. Vandenbrink attended the second day of the inspection. Doc 63, Ex. 3 at 34. Based on that inspection, Davidson created a final punch list of items ("Final GSA Punch List") that needed to be completed. *Id.* ¶ 17. Davidson identified 139 defective items. *See* Doc. 63, Ex. 14 ("Davidson Inspection") at 24–30. Among the major defects, he noted that as many as 50% of the bolts were missing on some toilets, that thermostats were either missing or in the wrong location throughout the space, and that the floor was unlevel. Accordingly, his Conditional Survey Report stated that he made "No Recommendation," meaning that he "did not make a recommendation that the Project was substantially complete." *Id.* ¶ 21; Doc. 63 Ex. 3 at 34. Plaintiff received the Final GSA Punch List on May 8, 2023. Pl.'s Reply ¶ RR.

The Government tenants signed a lease for the Space on April 20, 2023. *Id.* ¶ 34; Doc. 63, Ex. 2 at 3. However, Eric Warden, the Chief Operations Officer of UIRC, testified that the Government tenants did not begin to pay rent until June 27, 2023. Warden Dep. 157:12–22. At the end of April, Brown sent four emails to Vandenbrink about Draw 7. *Id.* ¶ 37. On April 27, 2023, Ellis also sent an email to Vandenbrink and informed him that Point Contracting had "completed the agreed punch list" and expected prompt payment. Pl.'s Mot. for SJ ¶ 39; Doc. 61, Ex. 2 at 36. He went on to say that if Vandenbrink agreed with the remaining Point responsibilities he would "begin reaching out to [their] subcontractors to make corrections as noted." Doc. 61, Ex. 2 at 36. VandenBrink replied he agreed that Plaintiff had "accomplished the punch list

6

provided" and that payment was due." Pl.'s Mot. for SJ ¶ 39. However, he would need to re-confirm with Defendant UIRC "that nothing outstanding is significant enough to be perceived as a reason for non-payment." Doc. 63, Ex. 2 at 36.

Brown reached out to Warden on May 12, 2023, about the unpaid invoices. Doc. 63, Ex. 16 at 7. Ellis responded, "I could be wrong, but it looks like you are looking for 100% payment for the project? The project is not finished yet." *Id*. Brown emailed Ellis back and said that the project was "complete according to the completed punchlist approved by your project manager." *Id.* at 6. Brown resent Draw 7. After reviewing the invoice, Warden told Brown that though he acknowledged that Plaintiff sought $233,784.73, Defendants were "looking to keep retainage of 100,000." Pl.'s Mot. for SJ ¶ 41; Doc. 63 Ex. 16 at 5. Ellis then stepped into the conversation. He rebuffed Warden's request for retainage, writing "we have completed a final punch list" and insisting that Point should be paid in full. Doc. 63, Ex. 15 at 4. Warden vehemently disagreed. He told Ellis that the project was "not close to complete" and that "62 items need to be addressed." Pl.'s Mot. for SJ ¶ 57. Defendants ultimately retained $75,000. *Id.* ¶ 42. Plaintiff anticipated that these funds would be released once the Final GSA Punch List was complete. *Id.* ¶ 43.

Plaintiff believes they finished the Final GSA Punch List on May 25, 2023. Pl.'s Mot. for SJ ¶ 44. Defendants counter that Plaintiff "was far from completion of the Final GSA Punch List items on May 25, 2023." Defs.' Resp. ¶ 44. Indeed, Defendants put forth that Plaintiff was "completely absent" from the Project "in February 2023, March 2023, 80% of April 2023 and 80% of May 2023." *Id.* ¶ H.

On June 15, 2023, Defendants' property manager, Lisa Gutierrez, emailed Plaintiff regarding a few pending items. *Id.* ¶ 46. Plaintiff responded and explained that all of the listed issues had either already been addressed or were outside of Plaintiff's assigned scope of work. *Id.*

Gutierrez never responded. *Id.* ¶ 47; Pl.'s Mot. for SJ ¶ 47. In her affidavit, Gutierrez explains that, in addition to the items listed in her email, "[t]here was still significant other work on that GSA Final Punchlist that needed to be done on June 15, 2023, but UIRC had hired or decided to hire other contractors to do that work instead of Point." Doc. 63, Ex. 8 ("Gutierrez Aff.") ¶ 18; Defs.' Resp. ¶ 46. Point Defendants allege that on June 27, 2023, "the Owner's new repair and replacement contractors completed much of the work on the GSA Final Punch List." Defs.' Resp. ¶ XX. For instance, Defendants state that "the floors that were within Point's scope of work were significantly unlevel" and that Point "failed to properly install the grounding tower at the Property . . . Plaintiff's electrical subcontractor even installed portions of it upside down." *Id.* ¶¶ X–Y. They estimate that they paid more than $100,000 to repair and completion contractors. Doc. 17 at 33; Doc. 61, Ex. 2 at 45; *see, e.g.*, id. at 49 (invoice to Code Electric for $114,908.94). Plaintiff rebukes this assertion. They state that "BLM changed the specifications for the tower grounding, but Defendants never executed a change order for this work." Pl.'s Reply ¶ Y.

Defendants contend the project was completed on July 19, 2023. Pl.'s Mot. for SJ ¶ 51. Plaintiff counters that the project was complete on April 20, 2023, and the work it performed after that date was warranty work. *Id.* ¶ 52. Plaintiff asserts that Defendants owe an outstanding balance of $88,586.06—$75,000 worth of retainage and $13,586.06 from an unpaid change order. *Id.* ¶ 54; Second Ellis Dep. 221:7–16.

Defendants admit that they did not pay Plaintiff but emphasize that they provided accounting on the amount spent on repair and completion contracts and those expenses exceeded $88,586.06. Defs.' Resp. ¶¶ 53–54, YY. Defendants highlight that during the course of discovery, Plaintiff offered "little to no evidence that any of its subcontractors were performing any

substantive work on the various punch lists at any time in 2023" and provided "no documents or information that it paid any of its subcontractors in 2023." *Id.* ¶¶ 49, G.

## LEGAL STANDARD

Summary judgment is appropriate if "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the burden of "informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once this requirement is met, the non-movant can defeat summary judgment by showing that there is a genuine dispute of material facts. *Id.* The non-movant's response must "set forth specific facts by reference to affidavits, deposition transcripts, or other exhibits to support the claim." *Serna v. Colo. Dep't of Corr.*, 455 F.3d 1146, 1151 (10th Cir. 2006). The Court views the evidence and draws any inferences in the light most favorable to the party opposing summary judgment. "The dispute about a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Walkingstick Dixon v. Okla. ex rel Regional Univ. Sys.*, 125 F.4th 1321, 1333 (10th Cir. 2025).

## DISCUSSION

I.    Plaintiff's Prompt Payment Act Claim

New Mexico's Prompt Payment Act ("PPA") obligates contractors to promptly pay their subcontractors and imposes penalties if they fail to do so. N.M. Stat. Ann. §§ 57-28-5(C), 57-28-11 (2025). The PPA instructs that "all construction contracts shall provide that payment for amounts due shall be paid within twenty-one days after the owner receives an undisputed request for payment." *Unified Contractor, Inc. v. Albuquerque Hous. Auth.*, 400 P.3d 290, 304 (N.M. Ct. App. 2017). To dispute an application for payment in good faith, the owner must "notify the

9

[contractor] of the invoice within seven days of receipt in what way the invoice is improper[ ].” *Id.* A dispute occurs when the owner “affirmatively raise[s] questions or challenges to the application for payment.” *White Sands Constr., Inc. v. City of Las Cruces*, 534 P.3d 1015, 1023 (N.M. Ct. App. 2023). If a contractor or owner fails to pay the amount due within 21 days of receiving an invoice, they must pay interest computed at one and one-half percent of the amount due, per month, until payment is issued, and the court may award court costs and reasonable attorney’s fees. N.M. Stat. Ann. § 57-28-5(C); *UNS Energy Corp. v. Shiver Constr. Co.*, No. 1:22-CV-00087-KG-LF, 2022 WL 17581450, at *4 (D.N.M. Dec. 12, 2022).

Plaintiff alleges that Defendants failed to properly dispute Draw 7 within the prescribed seven-day window. Pl.’s Mot. for SJ at 16. “Defendants did not acknowledge Draw 7 until April 10, 2023—41 days after they received it” and “never sent any communication labeled as ‘Notice of Dispute’ to Draw 7.” *Id.* Plaintiff views these facts as undisputed. *Id.* Defendants articulate two primary defenses. First, Defendants argue that Draw 7 was improper because, as of February 28, 2023, “Plaintiff had not obtained substantial completion which would warrant its entitlement to full payment.” Defs.’ Resp. at 21. Second, Defendants maintain that the punch lists sent on March 1 (from Vandenbrink to Plaintiff) and March 3 inspection (from GSA to Plaintiff) effectively disputed Draw 7. *Id.* at 24. They urge that Plaintiff received “two separate communications that expressly disputed Plaintiff’s entitlement to final payment and detailed what work still needed to be done at that time.” *Id.* at 25. Plaintiff dismisses the first contention as distracting from the core issue—that it was incumbent upon Defendants to explicitly communicate that disagreement. Plaintiff similarly argues that the inspection reports are inconsequential to its PPA claim because they did not “affirmatively raise questions or challenges to the application for payment.” Pl.’s

Mot. for SJ at 17.  Plaintiff maintains that they are entitled to statutory interest under § 57-28-5 of the PPA.  *Id.*

A. Draw 7 Sought Final Payment and is Therefore Governed by Section 57-28-8 of the Prompt Payment Act.

The Court begins with the question of whether Draw 7 was premature.  Plaintiff, Defendants, and the record are unequivocal that Plaintiff intended Draw 7 as the final invoice for the project.  Plaintiff admits that Draw 7 "sought final payment" and that "there is no dispute that Draw 7 properly reflected the final amount due to Plaintiff."  Pl.'s Mot. for SJ at 18, 24 n.9.  Brown's email to Vandenbrink stated that the invoice was for "final billing" and at his deposition, Ellis confirmed that Draw 7 sought "full payout," meaning a "hundred percent of the change orders and contract amounts."  Defs.' Resp. at 21; Second Ellis Dep. 193:7–13.[2]

Defendants' primary argument is that "Plaintiff was not entitled to final payment until the GSA approved Plaintiff's work on the Final GSA Punch List."  Defs.' Resp. at 22.  The parties then quarrel over whether the Government tenant's acceptance of the Space was a necessary condition for substantial completion and, in turn, for Draw 7 to be valid.  The Court does not wade into that dispute.

Instead, the Court finds that both parties overlook a key provision of the PPA governing applications for final payment.  Section 57-28-8 (entitled "Final Payment") states that:

> Ten days after certification of completion, any amounts remaining due the contractor or subcontractor under the terms of the contract shall be paid upon presentation of the following: (A) a properly executed release and duly certified voucher for payment; (B) a release, if required, of all claims and claims of lien against the owner arising under and by virtue of the contract other than such claims

---

[2] The Court notes that in a later email exchange between Brown and Warden, Brown states that Plaintiff "didn't request 100% payment." Doc. 63, Ex. 16 at 6.  However, Plaintiff does not at any point rely on this email to argue that Draw 7 was not a "final invoice."  To the contrary, Plaintiff repeatedly and consistently refers to Draw 7 as a request for final payment.  Pl.'s Reply at 5 ("In short, final GSA approval was not a prerequisite to final invoicing under the Contracts."); *id.* at 3 ("Plaintiff did complete a punch list prepared and generated by the GSA before it submitted its final invoice."); Doc. 14 (Second Am. Compl.) ¶ 78 (alleging Defendants failed to pay the final invoice (Draw 7) in full).

of the contractor, if any, as may be specifically excepted by the contractor or subcontractor from the operation of the release in stated amounts to be set forth in the release; and (C) proof of completion.

N.M. Stat. Ann. § 57-28-8 (2025).  Section 57-28-8 places responsibility upon the contractor or subcontractor who is seeking final payment to offer the requisite documents to the payor.  The statute specifies that final payment will be made "upon presentation" of the three enumerated items.  Black's Law Dictionary defines presentation as "[t] he delivery of a document to an issuer or named person for the purpose of initiating action under a letter of credit."  *Presentation*, Black's Law Dictionary (12th ed. 2024). The Oxford English Dictionary defines presentation as "the action of delivering, giving, etc." and "the action of offering something for acceptance."  *Presentation*, Oxford Eng. Dictionary (2007).  Plainly read, section 8 makes clear that the contractor must "deliver" or "offer" the requisite documentation to receive final payment.

No court has interpreted or cited § 57-28-8.  But its plain text appears to encompass all requests for final payment, including Draw 7.  Plaintiff, as the party seeking final payment, bore the burden of providing Defendants with a properly executed release, a release of all claims and liens, and proof of completion.  Plaintiff presents no evidence that it complied with, or was even aware of, § 57-28-8.  In fact, it would have been impossible for Plaintiff to do so since final payment is only appropriate after certification of completion, Draw 7 was sent on February 28, 2-23, and  Plaintiff concedes that the undisputed evidence "shows that Plaintiff substantially completed the Project no later than April 2023."  Pl.'s Mot. For SJ at 24; Pl.'s Reply ¶ AA; § 57-28-8.  The Court therefore concludes that Draw 7 was a premature and invalid request for final payment.

B. <u>Plaintiff's Failure to Comply with Section 57-28-8 Precludes Recovery of Statutory Penalties Under Section 57-25-5.</u>

Still, the statute's text does not settle how a contractor's failure to comply with § 57-28-8

interacts with an owner's duty to dispute invoices under § 57-28-5. Put differently, the present case asks whether a contractor can shirk its duties under the final payment provision, send a final invoice, and saddle the owner with disputing the request, or else incur statutory interest? Likely not.

When analyzing multiple provisions within a statutory scheme, the Court must consider the scheme holistically, "construing each section or part in connection with every other part or section so as to produce a harmonious whole." *State v. Baca*, 104 P.3d 533, 536 (N.M. Ct. App. 2004). The Court should "strive to ensure that no part of the statute is rendered surplusage or superfluous." *State v. Adams*, 503 P.3d 1130, 1133 (N.M. 2021). Section 57-28-5 makes it incumbent upon the owner to dispute an "improperly completed invoice" within seven days of receipt. N.M. Stat. Ann. § 57-28-5 (2025). The section does not distinguish between invoices for final payment and all other invoices. A broad reading would suggest that a premature final payment invoice is an "improperly completed" invoice to which the owner's duty to dispute attaches. That is Plaintiff's view; that "[i]f Defendants thought the invoice was premature, it was incumbent upon them to 'affirmatively raise questions or challenges' within seven days." Pl.'s Mot. for SJ at 18. However, that interpretation would erase the contractor's duty of presentation under § 57-28-8 and enable contractors to demand final payment at any time without taking the requisite statutory steps. The Court finds that position untenable. At minimum, the contractor must attempt to meet § 57-28-8's requirements to trigger the owner's duty to dispute.[3] Plaintiff thus cannot recover penalties without first executing its statutory duties.

---

[3] Theoretically, the statute could allow for statutory penalties if a contractor makes a good faith effort to meet § 57-28-8's specifications yet errs to some degree and the payor fails to inform the contractor that the invoice is improperly completed. However, that is not the scenario presented here. Plaintiff has not included any evidence that it presented the requisite documentation for final payment.

Cases applying other states' prompt payment acts affirm this result. In *MTR Builders, Inc. v. Jahan Realty Mgmt. Corp.*, No. 1 CA-CV 14-0650, 2016 WL 1425797, at *3 (Ariz. Ct. App. Apr. 12, 2016),[4] a contractor sought statutory interest for an unpaid invoice and alleged that the "Owner never issued a written statement within the terms of the act to notify Contractor it would not approve the billing." *Id.* There, as here, the contested invoice was for final payment. Arizona's PPA mandates that a contractor submit its final billing "[o]n final completion of the work." A.R.S. § 32–1129.01(K). Final completion means either (1) when the work "has been completed in accordance with the terms and conditions of the construction contract," or (2) the "date of final inspection and final written acceptance by the governmental body that issues the building permit." *Id.* The Arizona Court of Appeals found that the contractor "could not submit a billing for Draw 5 before obtaining final approval of the third-party inspector." *MTR Builders*, 2016 WL 1425797, at *3. Statutory penalties were therefore unavailable because "under the Prompt Pay Act, Contractor's request for payment was premature." *Id.*

Similarly, a Missouri court found that a contractor was not entitled to statutory penalties where the contractor "never presented evidence of a certificate of completion" despite Missouri's PPA making final payment dependent upon completion or certification of completion from the contracting authority. *Env't Prot., Inspection, & Consulting, Inc. v. City of Kansas City*, 37 S.W.3d 360, 371–72 (Mo. Ct. App. 2000); Mo. Rev. Stat. § 8.960(8) (2022). Without that documentation, the contractor "destroyed the submissibility of its case." *Env't Prot., Inspection, & Consulting*, 27 S.W.3d at 371. The court explained that "[b]ecause the late payment interest remedy is a statutory creation, compliance with the statutory prerequisites is mandatory." *Id.*

In line with these cases and the statute's text, the Court concludes that Plaintiff did not

---

[4] As the only court to consider, or even cite § 57-28-8, the Court looks to other states' interpretations of their PPA for guidance.

14

adhere to § 57-28-8's requirements and Defendants were not obligated to dispute Draw 7. Plaintiff therefore cannot recover statutory penalties for Defendants' non-payment.

C. Defendants Violated the PPA to the Extent They Withheld Retainage for Work Already Performed.

The Court now considers whether Defendants violated the PPA when they withheld retainage in May of 2023. "Retention amounts are a form of security generally retained by the owner from prior payments due for work previously performed. Authorities have noted that a retention occurs when the owner retains a percentage from each progress payment as a form of security against potential mechanics' liens and as security that the contractor will complete the work properly and repair defects." *Salsbury Eng'g, Inc. v. Consol. Contracting Servs., Inc.*, No. G057832, 2021 WL 791624, at *4 (Cal. Ct. App. Mar. 2, 2021). New Mexico's PPA previously permitted an owner to withhold payment in an escrow account if they believed the contracted work had not been substantially completed. *J.R. Hale Contracting Co. v. Union Pac. R.R.*, 179 P.3d 579, 600 (N.M. Ct. App. 2007) ("Retainage may be held under certain circumstances, and therefore not paid, until substantial completion of the applicable work, but only 'if the escrow arrangement described in Section [57–28–6] of the Retainage Act is used.'" (citing N.M. Stat. Ann. § 57–28–5(F) (2001)). The New Mexico legislature repealed that provision in 2007. The PPA now prohibits owners, contractors, and subcontractors from "retain[ing], withhold[ing], or hold[ing] back or in any other manner not pay[ing] amounts owed for work performed." § 57-28-5(E).

It is undisputed that Defendants withheld $75,000 from Draw 7 on May 15, 2023. *See* Pl.'s Mot. for SJ at 25; Doc. 63, Ex. 16 at 5. However, the PPA's retainage bar only applies if the owner withholds funds for "work performed." It is unclear whether Defendants withheld payment for work already performed since Draw 7 was a final payment invoice, rather than a progress invoice. Both the shell and TI invoice simply state that they are for final payment. They do not enumerate

the cost of work performed, amounts paid to subcontractors, or provide any other details that would permit the Court to decipher how much Plaintiff expended. Defendants also aver that Plaintiff did not include any invoices from before Plaintiff offered "little to no evidence that any of its subcontractors were performing any substantive work on the various punch lists at any time in 2023" and provided "no documents or information that it paid any of its subcontractors in 2023." Defs.' Resp. ¶¶ 49, G. Plaintiff did not submit documentation to rebut these assertions. Pl.'s Reply ¶ 49 (arguing that Defendants failed to properly request this information during discovery).

The circumstantial information in the record is likewise inconclusive. Defendants represented that the retainage would cover "the scope of work needed to be done to complete the final GSA Punch List." Defs.' Resp. ¶ 20. Warden told Ellis that retainage of $100,000 was "more than fair right now since most of the work outstanding or rework required may be more than that in the event Point walks away," but that he was offering "to pay Point for the work complete." Doc. 61, Ex. 2 at 50. Ellis replied that there was "no way" that there was $100,000 worth of work left for Point. *Id.* at 51. The emails do not distinguish between TI and shell work, though Defendants appear to have retained funds solely from the shell contract.

To whatever extent the amount Defendants retained cut into the amount owed for work already performed, Defendants violated the PPA. *See* 3 No. 1 Journal of the American College of Construction Lawyers 5, Survey of Prompt Pay Statutes ("New Mexico does not allow for retainage to be withheld."); *accord Miller v. N.M. Dep't of Transp.*, 741 P.2d 1374, 1376 (N.M. 1987) ("Statutes are to be read in a way that facilitates their operation and the achievement of their goals."). However, because the record does not establish whether Plaintiff had performed the whole of Draw 7 as of May 15, 2023, there is a question of fact as to how much, if any, of the

16

retainage was improperly withheld.  The Court therefore denies summary judgment on the PPA claim.

II.       Breach of Contract Claims

Plaintiff next seeks summary judgment on its breach of contract claims.  A party claiming breach of contract has the burden of proving the existence of the contract, breach of the contract, causation, and damages.  *Cent. Mkt., Ltd. v. Multi-Concept Hosp., LLC*, 508 P.3d 924, 935 (N.M. Ct. App. 2022).  A breach occurs when a party fails to perform a duty imposed by an agreement. *Sanders v. FedEx Ground Package Sys., Inc.*, 18 P.3d 1200, 1208 (N.M. 2008); *Kreischer v. Armijo*, 884 P.2d 827, 829 (N.M. Ct. App. 1994).

Plaintiff alleges that "the undisputed evidence shows that Plaintiff substantially completed the work required of it under the Contract and Defendant never released Plaintiff's final payment." Pl.'s Mot. for SJ at 23.  "Defendants' failure to pay Plaintiff in full, even after (1) the Government Tenants agreed to retake possession of the Property, (2) Plaintiff completed what Defendants acknowledged was the final punch list, and (3) Defendants' project manager stated in writing that he agreed that Plaintiff's payment was due," constituted a breach.  *Id.* at 25–26.  They point to the following contractual provision as the basis for their claim: "Owner shall pay Contractor the fixed amount . . . as compensation in full for the Work and Contractor's obligations under the Contracts." *Id.* at 23–24; Doc. 61, Ex. 2 at 18.

Defendants do not effectively respond to this claim. They begin with the note that "Plaintiff's Motion contains no prayer relief, so it is unclear what aspect of the pleadings in this case that it is seeking summary judgment."    Defs.' Resp. at 32.  Defendants then interpret Plaintiff's motion as asking for summary judgment on its second claim for foreclosure of its lien claims and raise an affirmative defense.  *Id.*

Defendants misapprehend Plaintiff's motion. Although the Court agrees that Plaintiff imprecisely requests summary judgment "on its breach of contract claims" without distinguishing between the three contract counts articulated in its complaint, it disagrees that Plaintiff seeks summary judgment on its lien claim. Rather, the Court reads Plaintiff's motion as asking for summary judgment on all three breach of contract claims and not the lien claim.

Defendants' misunderstanding does not, however, entitle Plaintiff to summary judgment. Pl.'s Reply at 10 (arguing that Defendants do not respond to the breach of contracts claim and that they "have waived any arguments they might have asserted"). The Tenth Circuit has held that a district court cannot grant summary judgment without making the determinations required by Rule 56. *Reed v. Bennett*, 312 F.3d 1190, 1193 (10th Cir. 2002). Accordingly, the Court will independently evaluate whether a genuine dispute of material fact exists over the breach of contract claims.

A. <u>There is a genuine dispute of material facts regarding whether Plaintiff substantially completed its work under the contract.</u>

Plaintiff's breach of contract claims fail because Plaintiff fails to show a violation of the parties' contracts. The Contract between the parties includes the Work Agreement and the attached exhibits, labeled A through C. Doc. 61, Ex. 2 at 8. Plaintiff relies on Section 4 of the Work Agreement to assert a breach. Plaintiff correctly observes that Section 4 demands that the owner "pay the fixed amount specified in Exhibit B." *Id.* But Plaintiff omits that the Owner "may withhold amounts that Owner disputes are payable, pending resolution of the dispute, and as Owner deems necessary to protect itself due to breach of this Agreement or loss or damage arising out of the Work that is incurred by or sought from Owner." Doc. 61, Ex. 2 at 10. Moreover, if the Contractor fails to correct its work after completion, the Owner "may arrange for another

18

contractor to perform the repair or replace and Contractor shall pay amounts due to the separate contractor." *Id.* at 11.

It is a basic tenet of contract law that "a writing is interpreted as a whole, and all writings that are part of the same transaction are interpreted together." *Crow v. Capitol Bankers Life Ins. Co.*, 891 P.2d 1206, 1211 (N.M. 1995). "Each word, phrase, and section of a contract should be analyzed in its context within the contract as a whole so as to realize the intentions of the parties." *Id.* Applying this principle to the present case, the Contracts make plain that Plaintiff is not unconditionally entitled to final payment even once the project is substantially completed. The Contracts grant Defendants the right to pass the cost of hiring third-party subcontractors onto the Plaintiff. Here, Defendants claim they retained various repair and completion contractors to complete certain scopes of work required to be completed by Plaintiff under the Contracts. Defs.' Resp. ¶ YY; Doc. 63, Ex. 4 ¶ 44. For instance, Plaintiff was assigned plumbing, electrical and flooring work. Defendants allege that Plaintiff "failed to properly install the grounding tower," never leveled the floors, and performed defective plumbing work. *Id.* ¶¶ X–Y; *see* Davidson Inspection at 8 (noting that grounding is incomplete). This disagreement was explicitly communicated between the parties. Ellis believed that the final punch list was completed on April 17, 2023, and that "any additional items were and are warranty work." Doc. 61, Ex. 2 at 81. Warden countered that, as of mid-May, the work was "not close to complete" and that that the remaining work was "quite extensive." Defs.' Resp. ¶ 41. Defendants had extensive conversations with the plumbing subcontractor about ongoing issues in the men's urinals. *See* Doc. 63, Ex. 13; *see also* Warden Dep. 184:6–185:4 (testifying that UIRC hired outside contractors to fix the height of the sinks and mirrors). It also appears they paid a third-party electrical subcontractor to wrap up the electrical work and Vandenbrink's affidavit attests that "the floors that were within Point's

19

scope of work were egregiously unlevel." Doc. 63, Ex. 4 ¶ 20. As of June 2023, Vandenbrink stated that "a couple of major items, including but not limited to the unlevel floors and installation of the grounding tower, were still not done." *Id.* ¶ 44. Plaintiff of course offers a different account of events. They allege that Defendants changed the specifications for the tower grounding without executing a change order. Pl.'s Reply ¶ Y.

In sum, the record is rife with conflicting evidence as to whether Plaintiff completed its obligations under the contract and, if not, whether the cost of third-party contractors exceeded the amount Defendants owed Plaintiff. This discord likewise creates a genuine dispute over whether Defendants violated the implied covenant of good faith and fair dealing. New Mexico imbues an implied duty of good faith and fair dealing into every contract. *Jaynes v. Strong-Thorne Mortuary, Inc.*, 954 P.2d 45, 49 (N.M. 1997). "The breach of this covenant requires a showing of bad faith or that one party wrongfully and intentionally used the contract to the detriment of the other party." *Continental Potash, Inc. v. Freeport-McMoran, Inc.*, 858 P.2d 66, 82 (N.M. 1993). "Bad faith exists where a party's conduct 'constitutes a wanton disregard' for the nonbreaching party's rights." *Paiz v. State Farm Fire & Cas. Co.*, 880 P.2d 300, 310 (N.M. 1994). The record establishes that Defendants' decision to withhold payment was not "wanton" and was premised on a well-founded belief that Plaintiff shirked its contractual duties. The Court therefore denies Plaintiff's motion for summary judgment as to the breach of contract claims.

III.    Defendants' Counterclaim

Lastly, Plaintiff asks for summary judgment on Defendants' counterclaim for breach of contract. Defendants allege that Plaintiff "walked off the project without completing all of the many defective and incomplete construction work set forth in the GSA's Final Punch List." Doc. 17 ¶ 7. Plaintiff argues that this claim "fails as a matter of law because Defendants never provided

20

contractually mandated notice and opportunity to cure before hiring replacement contractors." Pl.'s Mot. for SJ at 19–20.

The Court finds that, at minimum, Warden's May 15th email to Ellis provided sufficient notice of Defendants' dissatisfaction with Plaintiff's work. Plaintiff disregards this communication as inadequate; they remonstrate that the email is not "clear and unambiguous," is indicative of an ongoing negotiation, and fails to apprise Plaintiff of the concern that its inadequate performance was serious enough to justify invocation of another contractual remedy. *Id.* To the contrary, the Court reads Warden's email as providing unequivocal notice of the Plaintiff's inadequate performance. Warden explained that the project is "not close to complete" and that "62 items need to be addressed" from the Final GSA Punch List. Doc. 63, Ex. 16 at 4. "This does not include the bathrooms on the give back space that need to be completed as well." *Id.* Warden expresses that he hopes the parties can reach a compromise, but to let him know if that would not be possible "so that we can make other arrangements to finish this project up." *Id.*

These statements fall squarely within Plaintiff's own proposed standard—that the owner's notice "must fairly advise the contractor that the owner considers the inadequate performance serious enough to justify termination or invocation of another contractual remedy." *Deffenbaugh Indus., Inc. v. Unified Gov't of Wyandotte Cnty.*, No. 22-3147, 2023 WL 4363439, at *19 (10th Cir. July 6, 2023) ("Common sense tells us that to provide the defaulting party a meaningful opportunity to cure, a notice of default under § 11.02 must adequately describe the nature of the alleged default."). Plaintiff was in possession of the Final GSA Punch List that contained the 62 unfinished items and, adhering to its proposed completion date of April 20, 2023, should have completed those items within five days of receiving Warden's email. Doc. 61, Ex. 2 at 11 ("Contractor shall at its own expense within five days after Owner's notice repair or replace, as

21

directed by Owner, any portion of the Work that is defective in workmanship or material . . .").

Yet on Plaintiff's own account, there were nine outstanding items as of May 26, 2023.  Pl.'s Mot. for SJ ¶ 45; Warden Dep. 171:1–17.  Plaintiff's contention that Defendants did not notify them of their intent to use third-party subcontractors offers no refuge.  The Contracts only mandate that the Owner provide notice of the defect itself; they do not require the Owner to notify the contractor of their decision to hire outside workers.  Doc. 61, Ex. 2 at 11.[5]  To the contrary, once that notice is provided, the Owner is entitled to hire another contractor if the Contractor neglects its responsibilities.  *Id.* ("If the contractor fails to [repair or replace defective work] then the Owner may arrange for another contractor to perform the repair, and the Contractor shall pay amounts due to the separate contractor.").

At this stage, the Court finds that Defendants provided notice and an opportunity to cure. It does not reach the issue of whether Plaintiff did, in fact, cure the defective work.  The Court therefore denies summary judgment on Defendants' counterclaim for breach of contract.

## CONCLUSION

**IT IS THEREFORE ORDERED** that Plaintiff's motion for summary judgment (Doc. 61) is **DENIED**.

_____
**SARAH M. DAVENPORT**
**UNITED STATES DISTRICT JUDGE**

---

[5] Defendants cut-off communications with Plaintiff on June 16, 2023, after hearing that Plaintiff had retained counsel. Pl.'s Mot. for SJ at 23.  Plaintiff argues that Defendants decision to do so is the reason they were denied notice and an opportunity to cure.  The record does not support this chronology of events.  Plaintiff knew that, as of May 15th, Defendants were dissatisfied with Plaintiff's work.  It is likewise obvious that Plaintiff knew of these problems because it continued to work on the Space and purports to have finished the Final GSA Punch List on May 25, 2023.  Pl.'s Reply ¶ AA.  Defendants did not agree with that assessment.  The Contracts do not grant Plaintiff infinite attempts at repair.  If they failed to correct their defects, the Owner can proceed with outside contractors.  No additional notice is required.